**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| FRANK SMITH, | ) |
| WARREN GRIFFIN, | ) |
| ANTHONY DOBBINS, | ) |
| SEAN CLEMON, | ) |
| DOMINIQUE MAXWELL, | ) |
| PERRY HARRIS, and BARRY BOYCE | ) |
| | ) |
| Defendants. | ) |

Case No. 21-CR-30003-DWD

## <u>MEMORANDUM & ORDER</u>

The following motions are before the Court: the Motion to Suppress the Contents of Electronic Surveillance (Doc. 390), which was filed by Defendants Smith, Clemon, and Maxwell; the Motion to Suppress the Contents of Electronic Surveillance (Doc. 441), which is substantially the same as Doc. 390 and was filed by Smith alone; and the Motion to Suppress Any and All Electronic Surveillance Including Call Intercepts, GPS, and/or Location Data (Doc. 464), which was filed by Defendant Griffin. The Government filed a single Response in Opposition to those Motions (Doc. 544). The Court held a hearing and is now prepared to rule. For the following reasons, the Motions to Suppress are **DENIED**.

### I. Background

A grand jury in the Southern District of Illinois returned a 13-count Indictment (Doc. 1) against Smith, Clemon, Maxwell, Griffin, and three other co-Defendants. A 13-count Superseding Indictment (Doc. 671) was subsequently returned against Smith, Clemon, Maxwell, Griffin, and one other co-Defendant, alleging a racketeering

conspiracy in violation of 18 U.S.C. § 1962(d) and 1963(a) (Count 1). (Doc. 671). Smith, Clemon, and Maxwell were also charged with murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) and Section 2 (Count 2), use of a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A) and Section 2 (Counts 3, 6, 8, & 10), use of a firearm during and in relation to a crime of violence causing death under 18 U.S.C. § 924(j)(1) and Section 2 (Count 4), and attempted murder in aid of racketeering under 18 U.S.C. § 1959(a)(5) and Section 2 (Counts 5, 7, & 9). (Doc. 671). Griffin was also charged with murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) and Section 2 (Count 11), use of a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A) and Section 2 (Count 12), and use of a firearm during and in relation to a crime of violence causing death under 18 U.S.C. § 924(j)(1) and Section 2 (Count 13). (Doc. 671).

### A. Defendants' Motions to Suppress

In their Motions, Defendants challenge law enforcement's interception of electronic, wire, and oral communications pursuant to applications and supporting affidavits filed in the Eastern District of Missouri under 18 U.S.C. § 2518. Defendants seek an order suppressing any communication in which they participated or were referred, as well as any evidence derived from the communications. (Docs. 390, pg. 1; 441, pg. 1; Doc. 464, pg. 1). Defendants also seek to suppress GPS information related to the telephone numbers at issue. (Docs. 390, pgs. 1-2; 441, pg. 2; 464, pg. 2).[1] As support, Defendants

---

[1] Griffin also challenges the affidavits supporting the installation of a GPS device on a Cadillac and the tracking of a telephone ending in 9807. (Doc. 464, pgs. 7-8). He states those affidavits were not supported by probable cause due to insufficient facts and misstatements. (Doc. 464, pgs. 7-8). Similar arguments were raised at Doc. 465. The Court addressed those arguments at Doc. 725. Therefore, it does not do so here.

argue interceptions of communications are only statutorily permitted in "carefully delineated circumstances and only after securing judicial approval." (Docs. 390, pg. 3; 441, pg. 4; 464, pg. 4). Defendants argue such circumstances did not arise here, as normal investigative procedures accomplished the Government's objectives of the investigation and the supporting affidavits did not specifically address why other investigative procedures would fail or be too dangerous. (Docs. 390, pgs. 5-6; 441, pgs. 5-7; 464, pgs. 6-7). Alternatively, Defendants argue law enforcement failed to properly minimize the intercepted communications. (Docs. 390, pg. 6; 441, pg. 5; 464, pg. 6).

The Government filed a single Response in Opposition to the Motions to Suppress. (Doc. 544). Consistent with the affidavits in support of the applications for the interception of communications, the Government notes it used various investigative techniques. (Doc. 544, pgs. 2, 8). Without electronic surveillance, though, the Government states it did not have sufficient evidence to bring the charges in the indictment. (Doc. 544, pgs. 5-8). The Government claims it "provided a detailed list of the reasons that the electronic surveillance was necessary" and the associated affidavits "contain[ed]…lengthy necessity section[s]." (Doc. 544, pgs. 6-7). Further, the Government argues the intercepted communications were minimized. (Doc. 544, pg. 5). Although Defendants did not cite specific communications that required minimization, the Government notes that it provided reports to the authorizing court, noting the number

of intercepted communications, the number of pertinent intercepted communications, and the number of minimized communications. (Doc. 544, pg. 9).[2]

### C. The Hearing on Defendants' Motions to Suppress

On November 16, 2022, the Court held a hearing on Defendants' Motions to Suppress, where it received testimony from ATF Special Agent Timothy Miller. Further, at the hearing, the affidavits supporting the applications, as well as other documents pertaining to the procedures for minimizing intercepted communications, were admitted into evidence without objection.[3] [4] (Tr. at Doc. 636, pgs. 13-14); (Doc. 610). Defendants Clemon and Maxwell challenge the communications intercepted from the telephones of Defendants Maxwell and Smith. (Doc. 390, pg. 1); (Government's Exhibits 5-10). In addition to those intercepted communications, Defendants Smith and Griffin challenge

---

[2]These reports are not discussed in detail by the parties and were not made a part of the record.

[3]The exhibits relevant to Defendants' Motions to Suppress were manually filed with the Court. (Doc. 610). Government's Exhibit 1 is "Wheeler Wire I (773-312-6120) Title III Affidavit Jan 24, 2019"; Government's Exhibit 2 is "Wheeler Wire I: Rules, Procedures and Minimization Letter"; Government's Exhibit 3 is "Wheeler Wire II (773-312-6120) Title III Affidavit March 1, 2019"; Government's Exhibit 4 is "Wheeler Wire II: Rules, Procedures and Minimization Letter"; Government's Exhibit 5 is "Maxwell Wire: (573-200-3168): Title III Affidavit January 28, 2020"; Government's Exhibit 6 is "Maxwell Wire: Rules, Procedures and Minimization Letter"; Government's Exhibit 7 is "Smith Wire I (773-942-3159) Title III Affidavit April 30, 2020"; Government's Exhibit 8 is "Smith Wire I: Rules, Procedures and Minimization Letter"; Government's Exhibit 9 is "Smith Wire II (773-942-3159) Title III Affidavit June 10, 2020"; and Government's Exhibit 10 is "Smith Wire II: Rules, Procedures and Minimization Letter." (Doc. 610).

[4]The Court notes, with respect to the affidavits constituting Government's Exhibits 1, 3, 5, 7, and 9, Defendants, in neither their Motions nor at the hearing, alleged defects that would require adherence to *Franks v. Delaware*, 438 U.S. 154 (1978), and its progeny. Indeed, at the hearing, Smith's attorney indicated, "I know in our motion, or [in] my review of the other motions, there really aren't any specific allegations of false statements in the affidavits that would raise any *Franks* issues." (Tr. at Doc. 636, pg. 4). This appeared to represent the consensus of the other Defendants, as well. Further, this was the view of the Government at the hearing, where it stated: "As far as the *Franks* issue goes…there were not any allegations in any of the Defense motions of any inaccurate or untrue statements." (Tr. at Doc. 636, pg. 3).

the communications intercepted from the telephone of Daryl Wheeler. (Docs. 390, pg. 1; 441, pg. 1; 464, pg. 1); (Government's Exhibits 1-10). The evidence is summarized below.[5]

### 1. The Affidavit in Support of "Wheeler Wire I" and the Related Rules, Procedures, and Minimization Letter of the U.S. Attorney

On January 24, 2019, an 86-page affidavit in support of an application for the interception of communications, signed by ATF Special Agent Beth Dallas, was filed in the Eastern District of Missouri. (Government's Exhibit 1, pgs. 1, 86). The application and affidavit requested an order for the interception of communications from "Target Telephone #1," which ends in 6120 and was allegedly subscribed to Daryl Wheeler. (Government's Exhibit 1, pg. 3). Wheeler allegedly used "Target Telephone #1" for narcotics-related offenses. (Government's Exhibit 1, pgs. 3-4). Wheeler also allegedly used "Target Telephone #1" to communicate with other named "Target Interceptees," including Defendant Smith. (Government's Exhibit 1, pgs. 3, 57-64). The affidavit included sections about Smith and the eight other Target Subjects/Target Interceptees. (Government's Exhibit 1, pgs. 8-12). With respect to Smith, the affidavit, in part, stated:

> Frank SMITH is believed to be a Board Member within the national organization of the Gangster Disciples. SMITH is alleged to have ordered the assassination of Dushawn Wharton, a fellow Gangster Disciple member who at the time held the position of Governor of Missouri, in Bridgeton, MO on April 28, 2018. Wharton was injured by gunfire as a result of SMITH'S orders. Leroy Allen, an associate of Wharton and member of the Gangster Disciples, was killed during the assassination attempt. An administrative subpoena for subscriber information was submitted for

---

[5]The Court notes none of the parties fully summarized the affidavits in support of the applications for the interception of communications or the related rules, procedures, and minimization letters. Further, the Court did not receive that evidence until the hearing on November 16, 2022. In order to resolve the Motions, the Court has made a concerted effort to summarize that evidence in this Memorandum & Order.

SMITH'S NUMBER…. SMITH has also been identified via toll analysis and pen register activity as being in contact with Target Telephone #1.

(Government's Exhibit 1, pgs. 11-12).

Based on the investigation, Special Agent Dallas attested that there was probable cause Wheeler and the Target Interceptees, including Smith, committed and would commit certain narcotics-related Target Offenses. (Government's Exhibit 1, pg. 4). There was also probable cause that the interception of communications from "Target Telephone #1" would result in law enforcement obtaining the Target Interceptees' communications about the Target Offenses. (Government's Exhibit 1, pg. 4). In addition, there was probable cause that the communications would provide evidence related to the associates of the Target Subjects, the leadership and operation of the heroin distribution organization, records documenting the distribution of heroin, the methods for storage and distribution of drug proceeds, the assets of the organization, and the methods for laundering money. (Government's Exhibit 1, pg. 5). Finally, there was probable cause that the location of "Target Telephone #1" would itself constitute specific evidence of the Target Offenses. (Government's Exhibit 1, pg. 5). As support for probable cause, the affidavit detailed specific events, by date, that involved "Target Telephone #1" and narcotics-related activities. (Government's Exhibit 1, pgs. 17-57).

Special Agent Dallas attested that an authorization to intercept communications would further the goals and objectives of the investigation. (Government's Exhibit 1, pgs. 4, 64-65). Those goals and objectives included: discovering the scope and identities of key personnel in the drug trafficking organization; discovering the identities and roles of the

suppliers of heroin for trafficking; discovering Wheeler's main customers; discovering the drug "stash" locations and other locations used in furtherance of the drug trafficking organization; discovering the assets, money laundering techniques, and management and disposition of drug proceeds; and obtaining evidence for the prosecution of Wheeler, the other target subjects, and all others involved in the drug trafficking organization for the commission of the Target Offenses. (Government's Exhibit 1, pgs. 4, 64-65).

Special Agent Dallas indicated "normal investigative procedures" were tried but did not achieve the goals and objectives of the investigation. (Government's Exhibit 1, pgs. 5, 65). Those investigative procedures included: (1) physical surveillance, the constraints of which yielded evidence of a limited value; (2) a review of telephone toll records, pen register and trap and trace data, and subscriber information, which could not establish persons' identities or contents of communications; (3) the statements of a confidential informant, the limited nature of which could not support the prosecution of all members of the drug trafficking organization; (4) recorded telephone calls and text messages with "Target Telephone #1"; (5) controlled heroin purchases by a confidential informant, which could not fully identify the locations and processes for distributing drug proceeds, the equipment used for heroin distribution, the scale of distributors and sources of supply, or the assets and money laundering techniques of the drug trafficking organization; (6) a review of public records, including drivers' license and automobile registration records; and (7) a review of records from the National Law Enforcement Telecommunications System and the National Crime Information Center, which did not yield information about the other members of the drug trafficking organization.

(Government's Exhibit 1, pgs. 7, 66-71, 77-78). The affidavit also explained why certain investigative procedures were not used. (Government's Exhibit 1, pgs. 66, 72-79).

Finally, the affidavit contemplated the minimization of interceptions from "Target Telephone #1." (Government's Exhibit 1, pgs. 83-86). Special Agent Miller defined "minimization" as follows: "[M]inimization is a practice that occurs during the intercept itself, particularly during the audio intercepts…. When an audio call is live, a call is to be minimized when the conversation that is taking place is not connected to the criminal activity that is alleged in the affidavit." (Tr. at Doc. 636, pg. 10). The affidavit indicated an interception would be terminated if the named interceptees, or other members of the drug trafficking organization, were not participants in an interception, or if the interception was not criminal in nature. (Government's Exhibit 1, pg. 83). Special Agent Miller indicated the assessment of whether to minimize intercepted communications involves looking and listening for "a lot of coded language." (Tr. at Doc. 636, pgs. 77-78).

Further, the affidavit indicated a memorandum, outlining the guidelines for minimization and privileges, would be provided to all monitors. (Government's Exhibit 1, pgs. 83-84). In that memorandum, it was requested that each agent read the application, the supporting affidavit, the court order, and the guidelines. (Government's Exhibit 2, pgs. 2, 13). Each agent was also asked to sign a copy of the court order, which was to be posted in the monitoring room with the memorandum of guidelines, signifying that he or she read and was familiar with its contents. (Government's Exhibit 2, pgs. 2, 13).

Specifically, the guidelines required the following: (1) the agents to know the contents of the court order before beginning the interceptions, including the

conversations sought to be intercepted, the conversations relevant to the alleged offenses, the minimization requirements, and the requirement that interceptions terminate upon the attainment of the authorized objectives; (2) the execution of the interception authority as soon as practicable; (3) the recording of the interceptions; (4) the adherence of monitoring and minimization procedures, related to wire communications, to legal requirements and accepted professional standards for acquiring evidence; (5) a good faith determination that electronic (text message) communications were relevant to illegal activities; (6) the protection of recordings from alteration; (7) the submission of daily reports, detailing the nature and scope of interceptions, by the supervising agent to the supervising attorney; (8) the protection of privileged communications; and (9) the maintenance of a contemporaneous log of intercepted communications. (Government's Exhibit 2, pgs. 1-4, 6-11). The daily reports allowed the U.S. Attorney to "prepare the progress reports ordered by the Court." (Government's Exhibit 2, pg. 8).

## 2. The Affidavit in Support of "Wheeler Wire II" and the Related Rules, Procedures, and Minimization Letter of the U.S. Attorney

On March 1, 2019, a 156-page affidavit in support of a renewal of the authorization to intercept communications from "Target Telephone #1," ending in 6120 and allegedly subscribed to Wheeler, was filed in the Eastern District of Missouri. (Government's Exhibit 3, pgs. 1, 3, 156). The affidavit again alleged narcotics-related criminal offenses by Wheeler, and communications between 14 "Target Interceptees," including Defendant Smith, and "Target Telephone #1." (Government's Exhibit 3, pgs. 3, 8-13, 120-32). The affidavit also included the section that specifically described the Target Subjects/Target

Interceptees, including Smith. (Government's Exhibit 3, pgs. 8-13). Further, the affidavit identified, by four-digit numbers, unknown "Target Interceptees" communicating with "Target Telephone #1." (Government's Exhibit 3, pg. 3). As support for the attestations, Special Agent Dallas again detailed the facts establishing probable cause. (Government's Exhibit 3, pg. 19). In addition to the specific events alleged in the affidavit in support of "Wheeler Wire I," Special Agent Dallas alleged new events, by date, involving "Target Telephone #1" and narcotics-related activities. (Government's Exhibit 3, pgs. 19-120).

With respect to "Wheeler Wire I," Special Agent Dallas indicated much was revealed about the scope and nature of the alleged drug trafficking activities, including the identifies of co-conspirators. (Government's Exhibit 3, pg. 133). However, there was still a need for the interception of communications from "Target Telephone #1." (Government's Exhibit 3, pgs. 6, 132-56). Special Agent Dallas stated the information obtained from the authorization to intercept communications was presently insufficient to fully identify or bring legal proceedings against the co-conspirators. (Government's Exhibit 3, pgs. 133-34). Special Agent Dallas attested, "[i]nvestigators believe that only by continuing the interception in conjunction with the use of other investigative techniques…will investigators be able to fully identify all of the primary co-conspirators." (Government's Exhibit 3, pg. 134). The sections of the affidavit, pertaining to the investigative procedures that had been tried, were substantially the same as those contained in "Wheeler Wire I." (Government's Exhibit 3, pgs. 7, 134-140, 146-47); (Government's Exhibit 1, pgs. 7, 66-71, 77-78). The same is true for those sections of the affidavit that explain why certain investigative procedures were not used. (Government's

Exhibit 3, pgs. 133, 140-47, 150-51); (Government's Exhibit 1, pgs. 66, 72-79). Notably, the affidavit indicated, to date, the use of telephone location information "was not effective in narrowing the locations frequented by" Wheeler. (Government's Exhibit 3, pg. 148).

Other general aspects of the supporting affidavit were also substantially the same as the affidavit in support of "Wheeler Wire I," including the goals and objectives of the investigation, the value of intercepted communications from "Target Telephone #1" to the investigation, the probable cause related to the commission of "Target Offenses" by "Target Interceptees," and the evidence that would be obtained from intercepted communications for use in prosecutions. (Government's Exhibit 3, pgs. 4-6, 132-33); (Government's Exhibit 1, pgs. 4-6, 64-65). Further, Government's Exhibits 1 through 4, relating to each "Wheeler Wire" and the related rules, procedures, and minimization letters, contemplated the same minimization procedures. (Government's Exhibit 1, pgs. 83-86); (Government's Exhibit 3, pgs. 152-155); (Government's Exhibits 2 & 4, generally).

### 3. The Affidavit in Support of the "Maxwell Wire" and the Related Rules, Procedures, and Minimization Letter of the U.S. Attorney

On January 28, 2020, a 108-page affidavit in support of an application for the interception of communications, signed by Special Agent Dallas, was filed in the Eastern District of Missouri. (Government's Exhibit 5, pgs. 1, 108). The application and affidavit sought an order for the interception of communications from "Target Telephone #1," ending in 3168 and allegedly subscribed to Defendant Maxwell. (Government's Exhibit 5, pg. 3). Maxwell allegedly used "Target Telephone #1" for "Target Offenses" related to racketeering, conspiracy to commit racketeering, murder for hire, solicitation to commit

murder, and the distribution and possession of narcotics. (Government's Exhibit 5, pg. 3). The "Target Interceptees," with whom Maxwell allegedly communicated using "Target Telephone #1," included, *inter alia*, Wheeler and Defendants Smith and Clemon. (Government's Exhibit 5, pgs. 3, 81-87). The affidavit contained sections specifically describing Maxwell, Smith, Clemon, and 12 other Target Subjects/Target Interceptees. (Government's Exhibit 5, pgs. 8-17). With respect to Maxwell, the affidavit, in part, stated:

> Maxwell has been identified as the Assistant Governor of Missouri within the Gangster Disciples Organization ("GD"). As the Assistant Governor of Missouri for the GDs, MAXWELL is responsible for maintaining contact with incarcerated GDs which also allows him to be an active participant in the chain of command for non-incarcerated as well as incarcerated GDs. Based on the information we have obtained, MAXWELL's chain of command would include taking orders from the Governor of Missouri, SEAN CLEMON, and at least one National Board Member, FRANK SMITH. On at least one occasion, MAXWELL contacted CLEMON and F. SMITH prior to confirming an order for one GD inmate to murder another GD inmate. MAXWELL continues to contact F. SMITH on a frequent basis and CLEMON on a daily basis. MAXWELL was present during the attempted murder of Dushawn Wharton, the former GD Governor of Missouri in Bridgeton, Missouri on April 28, 2018. On that date, MAXWELL used his cellular telephone to contact F. SMITH. CLEMON used MAXWELL's phone, on speakerphone, and received an order from F. SMITH to kill Wharton. In June 2018, MAXWELL was identified by video surveillance as one of at least four shooters involved in an incident in Cape Girardeau, Missouri. In October 2018, MAXWELL ordered incarcerated GD members to kill MODOC Inmate "JD" and reiterated that order on a consensually recorded prison call with SAMUEL TAYLOR on October 19, 2019 and October 20, 2019.

(Government's Exhibit 5, pgs. 9-10). Relating to Smith, the affidavit, in part, stated:

> F. SMITH has been identified as a National Board Member of the GDs and in the past has given orders to MAXWELL. F. SMITH is alleged to have ordered the murder of Dushawn Wharton, on April 28, 2018, in Bridgeton, Missouri. Wharton, a fellow GD member at the time, held the position of Governor of Missouri. MAXWELL contacted F. SMITH on his cellphone, provided the phone to CLEMON who received the order to kill Wharton

> on speakerphone from F. SMITH. Wharton was injured by gunfire as a result of F. SMITH's orders. Leroy Allen, an associate of Wharton and member of the GDs, was killed during the attempted murder.

(Government's Exhibit 5, pg. 10). As for Clemon, the affidavit, in part, stated:

> CLEMON was present with MAXWELL during the attempted murder on Dushawn Wharton in Bridgeton, Missouri on April 28, 2018. On that date, MAXWELL utilized his cellular telephone, called F. SMITH who then spoke with CLEMON on MAXWELL's phone. During the call with CLEMON, F. SMITH ordered the hit on Wharton. CLEMON then relayed F. SMITH's order to other GDs member [*sic*] that were present.

(Government's Exhibit 5, pg. 12).

Special Agent Dallas attested that there was probable cause Maxwell, along with Smith, Clemon, and others, committed and would commit Target Offenses. (Government's Exhibit 5, pgs. 4-6). There was also probable cause that the interception of communications from "Target Telephone #1" would result in the Target Interceptees' communications about Target Offenses. (Government's Exhibit 5, pg. 6). Further, there was probable cause that the communications would provide evidence related to: the Target Offenses; the associates of the Target Subjects; the identities of individuals in leadership roles or positions of authority within the Gangster Disciples; the dates, times, and places of illegal activities, including assault, solicitation to commit murder, possession and use of firearms, sites for storage of firearms, and schemes for buying, selling, trading, and using firearms; the existence, location, management, and disposition of documents or records associated with the Gangster Disciples; the identification of incarcerated members of the Gangster Disciples; the nature, scope, places, and methods of operation for the Gangster Disciples; and the location and source of resources for the

Gangster Disciples' illegal activities. (Government's Exhibit 5, pgs. 6-7). As support for probable cause, the affidavit alleged specific facts related to, *inter alia*, the investigative background, Maxwell's communications with incarcerated Gangster Disciples members, Maxwell's communications relating to the order for the murder of "JD," and the conveyance of narcotics into correctional facilities. (Government's Exhibit 5, pgs. 21-81).

Further, Special Agent Dallas believed an authorization to intercept communications from Maxwell's telephone would determine and verify the roles of Gangster Disciples members, identify unknown members of the Gangster Disciples, provide information about orders for violence, and determine and verify methods for laundering proceeds from narcotics sales. (Government's Exhibit 5, pg. 21). Special Agent Dallas believed an authorization would also further the goals and objectives of the investigation, which included: (1) obtaining evidence to prosecute the Target Subjects, as well as other Gangster Disciples members, for the Target Offenses; (2) identifying personnel involved in and the scope of the alleged racketeering activity; (3) discovering the management and disposition of proceeds from the alleged racketeering activity; (4) discovering the methods for ordering the commission of crimes within the Gangster Disciples; and (5) determining the methods for and participants in the trafficking of controlled substances into correctional facilities. (Government's Exhibit 5, pgs. 87-88).

Special Agent Dallas indicated "normal investigative procedures" were tried but did not achieve the goals and objectives of the investigation. (Government's Exhibit 5, pgs. 7, 88). Those investigative procedures included: (1) physical surveillance, which resulted in a limited ability to gather evidence of criminal activities; (2) public records;

(3) telephone toll records, pen register and trap and trace information, and telephone subscriber information, which could not establish persons' identities or the contents of conversations; (4) the review of social media posts; (5) information from a single confidential source and another witness to the Bridgeton Murder, who, by themselves, could not lead to a guilty verdict against the Target Subjects or achieve the other goals and objectives of the investigation; (6) controlled purchases of narcotics by a confidential source from members of the Gangster Disciples, which did not glean information about racketeering activities; (7) trash searches, which yielded no evidence of criminal activity; (8) pole cameras and GPS tracking, which involved location restraints and an inability to gather complete information; (9) a financial investigation, which could not, by itself, indicate the methods for storing the Gangster Disciples' proceeds from the alleged racketeering activities; and (10) prison telephone calls, which were known to be recorded and, therefore, yielded only limited information and evidence. (Government's Exhibit 5, pgs. 8, 89-93, 95-100). The affidavit also explained why other investigative procedures were not attempted by investigators. (Government's Exhibit 5, pgs. 93-98).

In addition, the affidavit addressed the authorizations for the interception of communications from Wheeler's phone, as well as the investigation into Wheeler's activities. (Government's Exhibit 5, pgs. 100-01); (Government's Exhibits 1 & 3, generally). The "Wheeler Wires" provided insight into the structure and leadership of the national Gangster Disciples but were otherwise focused on only the narcotics-related activities of Wheeler. (Government's Exhibit 5, pg. 100). Special Agent Dallas attested,

"[n]o criminal activity with upper level or GD national board members was intercepted during the WHEELER wiretap[s]." (Government's Exhibit 5, pg. 100).

Finally, the affidavit contemplated the minimization of interceptions from "Target Telephone #1." (Government's Exhibit 5, pgs. 101-05). For example, the affidavit indicated an interception would be suspended if it was determined that the Target Subjects, or their confederates, were not participants in the interception, unless it was already determined that the conversation was criminal. (Government's Exhibit 5, pg. 102). A memorandum, outlining the guidelines for minimization and privileges, was to be provided to all monitors. (Government's Exhibit 5, pg. 107). The affidavit required reports, detailing the course and progress of the interception, to be filed with the Court "each fifteen (15) days following the continuation of interception." (Government's Exhibit 5, pgs. 107-08). Further, Government's Exhibit 6, relating to the Rules, Procedures, and Minimization Letter for the "Maxwell Wire," was substantially the same as Government's Exhibits 2 and 4. (Government's Exhibits 2, 4, 6, generally).

### 4. The Affidavit in Support of "Smith Wire I" and the Related Rules, Procedures, and Minimization Letter of the U.S. Attorney

On April 30, 2020, a 78-page affidavit in support of an application for the interception of communications, signed by Special Agent Miller, was filed in the Eastern District of Missouri. (Government's Exhibit 7, pgs. 1, 78). The application and affidavit requested an authorization for the interception of communications from "Target Telephone #2," ending in 3159 and allegedly subscribed to Defendant Smith. (Government's Exhibit 7, pg. 3). Smith allegedly used "Target Telephone #2" to

communicate with Target Interceptees, including Wheeler and Defendant Maxwell, about the business of the Gangster Disciples. (Government's Exhibit 7, pgs. 53-57).

The nine "Target Interceptees," including Wheeler and Defendants Smith and Maxwell, were specifically described in the affidavit. (Government's Exhibit 7, pgs. 6-13). In the section identifying Smith, Special Agent Miller attested, in part, to the following:

> F. SMITH has been identified as a National "Board Member" for the Gangster Disciples and in the past has given orders to MAXWELL. F. SMITH's Board Member status has been confirmed by investigators via review of recorded calls placed on correctional institution phone systems and information obtained from court-authorized phone intercepts (THE WHEELER PHONE and TARGET TELEPHONE 1). F. SMITH is believed to have ordered the Bridgeton Murder, as summarized more fully below. F. SMITH is also believed to be a participant in the "JD" Murder Conspiracy summarized more fully below.

(Government's Exhibit 7, pgs. 7-8). Similarly, Maxwell was described, in part, as follows:

> MAXWELL has been identified as the "Assistant Governor" of Missouri within the Gangster Disciples Organization. As the Assistant Governor of Missouri for the Gangster Disciples, MAXWELL is responsible for maintaining contact with incarcerated members, which also allows him to be an active participant in the chains of command for both non-incarcerated and incarcerated Gangster Disciples. In his role as Assistant Governor, MAXWELL is subordinate to, and receives orders from Sean CLEMON and F. SMITH. MAXWELL is believed to have been one of the shooters in the Bridgeton Murder, as summarized more fully below. MAXWELL is also believed to be one of the organizers of the "JD" Murder Conspiracy summarized more fully below.

(Government's Exhibit 7, pg. 8).

Clemon was identified as 1 of 6 "Target Subjects." (Government's Exhibit 7, pgs. 13-15). As a Target Subject, Clemon was "not expected to be intercepted as part of the requested order." (Government's Exhibit 7, pg. 13). He was described, in part, as follows:

CLEMON has been identified as the Governor of Missouri for the Gangster Disciples. CLEMON is believed to have been a participant in the Bridgeton Murder, as summarized more fully below.

(Government's Exhibit 7, pg. 13).

Special Agent Miller stated there was probable cause that an authorization for the interception of communications would yield evidence of "Target Offenses," including RICO conspiracy, murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, use of firearms in furtherance of violent crime, and aiding and abetting those offenses. (Government's Exhibit 7, pgs. 4-5, 16). There was also probable cause that at least two of the Target Interceptees committed and would commit the Target Offenses. (Government's Exhibit 7, pgs. 1, 78). As support for probable cause, the affidavit alleged specific facts related to the history and organization of the Gangster Disciples, the "JD" Murder Conspiracy, and the Bridgeton Murder. (Government's Exhibit 7, pgs. 23-53).

Further, Special Agent Miller stated the goals and objectives of the investigation included: (1) determining and verifying the roles of the leaders and members of the Gangster Disciples; (2) identifying unknown members of the Gangster Disciples; (3) identifying the regions of authority for national Gangster Disciples board members; (4) determining the source and methods of disseminating orders of violence within the Gangster Disciples; (5) preventing the Gangster Disciples and its members from carrying out acts of violence, including the "JD" Murder Conspiracy; (6) solving and prosecuting acts of violence and other crimes committed by the Gangster Disciples, including the Bridgeton Murder; and (7) dismantling the Gangster Disciples Organization. (Government's Exhibit 7, pgs. 16, 57-58). Intercepting communications from "Target

Telephone #2" would further those goals and objectives by revealing: (1) the identities and methods of the Target Subjects, their associates, and other members of the Gangster Disciples; (2) the locations and roles of the Target Interceptees, accomplices, aiders and abettors, co-conspirators, and other participants in illegal activities; (3) the existence and location of records related to the Target Interceptees' activities; (4) the location and source of resources for financing the illegal activities; (5) the location and disposition of the proceeds from illegal activities; and (6) the location of items (including other phones) that the individuals use to further the unlawful activities. (Government's Exhibit 7, pg. 16).

Special Agent Miller stated "normal investigative procedures" were tried but did not achieve the goals and objectives of the investigation. (Government's Exhibit 7, pgs. 16, 58). Those investigative procedures included: (1) physical surveillance, which involved architectural and other limitations on gathering evidence; (2) public records; (3) telephone toll records, pen register and trap and trace information, and telephone subscriber information, which could not establish persons' identities or the contents of conversations; (4) prison telephone calls, which were known to be recorded and did not involve "Target Telephone #2," provide information on Smith's alleged activities, or capture the chain of command's orders for incarcerated members of the Gangster Disciples; (5) the review of social media posts and YouTube data, which did not result in evidence of Smith's alleged activities; (6) a single confidential source and another witness to the Bridgeton Murder, who, despite providing information about Target Subjects and Target Interceptees, could not achieve the goals and objectives of the investigation; (7) controlled purchases of narcotics by a confidential informant, which did not connect

Smith or other national board members to racketeering activities; (8) interviews related to the Bridgeton Murder, including those of Maxwell and Clemon, which involved Defendants minimizing their culpability without implicating Smith; (9) pole cameras and GPS tracking, which were ineffective due to restraints on location, the design of Smith's apartment complex, and the inability to achieve the goals and objectives of the investigation; (10) a financial investigation, which did not yield significant results and was unlikely to implicate Smith in the Bridgeton Murder or the "JD" Murder Conspiracy. (Government's Exhibit 7, pgs. 5, 58-64, 66-70). The affidavit also explained why other investigative procedures were not used. (Government's Exhibit 7, pgs. 58, 63-66, 68).

Next, the affidavit addressed the authorizations for the interception of communications from Wheeler and Maxwell's phones, which provided insight into the structure and leadership of the national Gangster Disciples. (Government's Exhibit 7, pg. 70); (Government's Exhibits 1, 3, 5, generally). However, Special Agent Miller attested that those authorizations focused on the narcotics-related activities of Wheeler and the racketeering activity of Maxwell. (Government's Exhibit 7, pg. 70). The "Wheeler Wires" did not provide evidence of criminal activity against national board members within the Gangster Disciples. (Government's Exhibit 7, pg. 70). Likewise, while the "Maxwell Wire" demonstrated Smith's involvement in and motive for the "JD" Murder Conspiracy, it did not provide investigators with information about the involvement or awareness of other national board members in that conspiracy. (Government's Exhibit 7, pg. 70).

Finally, the affidavit contemplated the minimization of interceptions from "Target Telephone #2." (Government's Exhibit 7, pgs. 71-75). The minimization provisions were

substantially the same as those contained in the affidavit supporting the "Maxwell Wire."

(Government's Exhibit 7, pgs. 71-75, 77); (Government's Exhibit 5, pgs. 101-05, 107-08).

Likewise, Government's Exhibit 8, relating to the Rules, Procedures, and Minimization

Letter for "Smith Wire I," was substantially the same as Government's Exhibits 2, 4, and

6. (Government's Exhibits 2, 4, 6, 8, generally).

### 5. The Affidavit in Support of "Smith Wire II"
### and the Related Rules, Procedures, and Minimization Letter of the U.S. Attorney

On June 10, 2020, a 54-page affidavit in support of an application for a renewed

authorization to intercept communications from "Target Telephone #2," ending in 3159

and allegedly subscribed to Defendant Smith, was filed in the Eastern District of

Missouri. (Government's Exhibit 9, pgs. 1, 3, 54). Defendants Smith and Maxwell, along

with Wheeler and 12 others, were identified as "Target Interceptees." (Government's

Exhibit 9, pgs. 7-11). Clemon was identified as 1 of 6 "Target Subjects," who were "not

expected to be intercepted as part of the requested order." (Government's Exhibit 9, pgs.

11-12). The descriptions of Smith, Maxwell, and Clemon were incorporated by reference

to the affidavit filed in support of "Smith Wire I." (Government's Exhibit 9, pgs. 7-8, 12).

Further, Special Agent Miller stated there was probable cause that a renewed

authorization for the interception of communications would yield evidence of "Target

Offenses," including racketeering and racketeering conspiracy, murder in aid of

racketeering, conspiracy to commit murder in aid of racketeering, use of firearms in

furtherance of violent crime, and aiding and abetting those offenses. (Government's

Exhibit 9, pgs. 4-5). The affidavit also stated there was probable cause that the Target

Offenses were committed and would be committed by the Target Interceptees. (Government's Exhibit 9, pg. 7). As support for probable cause, Special Agent Miller detailed newly acquired facts relating to: (1) the "JD" Murder Conspiracy; (2) the "Bo G" Conflict; (3) the use of "burner" phones and "an unknown electronic communication channel" by Smith, Maxwell, and other members of the Gangster Disciples; and (4) the recent communications with "Gator." (Government's Exhibit 9, pgs. 22-33).

Special Agent Miller also attested to the goals and objectives of the investigation, which were substantially the same as those included in the affidavit in support of "Smith Wire I." (Government's Exhibit 9, pgs. 12-13, 33-34); (Government's Exhibit 7, pgs. 16, 57-58). However, in terms of preventing violence, Special Agent Miller added the "Bo G" Conflict. (Government's Exhibit 9, pg. 12). Also, the ways in which an authorization to intercept communications from "Target Telephone #2" would further the goals and objectives of the investigation were substantially the same between the affidavits for the "Smith Wires." (Government's Exhibit 9, pg. 13); (Government's Exhibit 7, pg. 16).

Special Agent Miller stated "normal investigative procedures" were tried but did not achieve the goals and objectives of the investigation. (Government's Exhibit 9, pgs. 13, 33). The discussion regarding investigative procedures was substantially the same between the affidavits in support of the "Smith Wires." (Government's Exhibit 9, pgs. 5-6, 34-46); (Government's Exhibit 7, pgs. 5, 58-70). For "Smith Wire II," Special Agent Miller added: (1) the witness to the Bridgeton Murder lacked knowledge of the "JD" Murder Conspiracy and the "Bo G" Conflict; (2) although it was determined that Smith resided in a Naperville, Illinois, neighborhood, and not a Chicago apartment, physical

surveillance remained difficult due to vigilant neighbors; (3) warrants relating to the device of "Gator" and Smith's "burner" phones were obtained by investigators, but those warrants were not likely to produce substantial evidence related to the Bridgeton Murder, the "JD" Murder Conspiracy, or the "Bo G" Conflict; and (4) a pole camera was mounted adjacent to Smith's residence, but trees blocked the camera, making it "nearly impossible to see the residence." (Government's Exhibit 9, pgs. 35-37, 39-40, 42).

The affidavit also restated the information related to the authorizations for the interception of communications from Wheeler and Maxwell's phones. (Government's Exhibit 9, pg. 46); (Government's Exhibit 7, pg. 70); (Government's Exhibits 1, 3, 5, generally). Special Agent Miller added that the prior interceptions of "Target Telephone #2" did not implicate any other board members in the "JD" Murder Conspiracy. (Government's Exhibit 9, pg. 46). However, the investigators learned "critical information" about the communications between Smith and state-level leaders within the Gangster Disciples. (Government's Exhibit 9, pg. 46). The investigators also learned that Smith discussed issues, such as the "Bo G" Conflict, with other high-ranking members of the Gangster Disciples. (Government's Exhibit 9, pgs. 46-47). Based on the intercepted communications, the investigators believed "Bo G" was in danger. (Government's Exhibit 9, pg. 47). As such, the continued monitoring of "Target Telephone #2" was necessary to prevent violence by the Gangster Disciples. (Government's Exhibit 9, pg. 47).

The minimization provisions contained in the affidavit were substantially the same as those in the affidavits for "Smith Wire I" and the "Maxwell Wire." (Government's Exhibit 9, pgs. 47-51, 53-54); (Government's Exhibit 7, pgs. 71-75, 77); (Government's

Exhibit 5, pgs. 101-05, 107-08). Further, Government's Exhibit 10, relating to the Rules, Procedures, and Minimization Letter for "Smith Wire II," was substantially the same as Government's Exhibits 2, 4, 6, and 8. (Government's Exhibits 2, 4, 6, 8, 10, generally).

## II. Analysis

In their Motions, Defendants challenge law enforcement's interception of communications pursuant to the applications and supporting affidavits filed in the Eastern District of Missouri under 18 U.S.C. § 2518. Specifically, Defendants argue law enforcement failed to comply with the statutory provisions pertaining to the necessity for and minimization of intercepted communications. *See* 18 U.S.C. § 2518(1)(c), (3)(c), (5). Under § 2518(10)(a), an aggrieved person may move to suppress the contents of wire or oral communications, or derivative evidence, on the basis that the communication was unlawfully intercepted, the order of authorization was facially insufficient, or the interception was nonconformant with the order of authorization. *Id.* § 2518(10).

### A. Necessity and Exhaustion

An application for an order authorizing the interception of wire, oral, or electronic communications shall include, *inter alia*, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). If the judge finds, *inter alia*, this showing was made by the applicant, then the judge may enter an order authorizing the interception of wire, oral, or electronic communications. *Id.* § 2518(3)(c); *accord U.S. v. Maggard*, 865 F.3d 960, 967 (7th Cir. 2017). Importantly, these requirements are stated in the alternative, such that the Government need only establish

one of the three. *See U.S. v. Adams*, 125 F.3d 586, 595 (7th Cir. 1997); *accord U.S. v. Gray*, 410 F.3d 338, 342-43 (7th Cir. 2005). Extensions of an order may be granted upon an application that complies with § 2518(1) and (3). *See* 18 U.S.C. § 2518(5).

The above-described "exhaustion or necessity requirement" was not intended to ensure authorizations to intercept communications are a last resort. *See U.S. v. Santiago*, 905 F.3d 1013, 1023, 1026 (7th Cir. 2018) (quoting *U.S. v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008); *U.S. v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006)); *accord Maggard*, 865 F.3d at 966-67. The requirement bars investigators from " 'routinely employ[ing] [authorizations to intercept communications] as the initial step in a criminal investigation.' [Citation]." *See Santiago*, 905 F.3d at 1023, 1026 (quoting *McLee*, 436 F.3d at 762-63); *accord Maggard*, 865 F.3d at 967. The Government's burden of establishing compliance with the requirement is not great and should be reviewed in a practical and commonsense fashion. *See U.S. v. Ceballos*, 302 F.3d 679, 683 (7th Cir. 2002) (quoting *U.S. v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988)); *accord Santiago*, 905 F.3d at 1023; *Maggard*, 865 F.3d at 967. It need not be shown that a prosecution would be impossible without the authorization to intercept communications, or that the evidence, possibly sufficient for an indictment, could not otherwise be obtained. *See Santiago*, 905 F.3d at 1023 (quoting *McLee*, 436 F.3d at 763). Likewise, if the success of other methods of investigation is unlikely, then the Government is not required to implement those methods before receiving an authorization to intercept communications. *See U.S. v. Dumes*, 313 F.3d 372, 378-79 (7th Cir. 2002) (quoting *U.S. v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991)); *accord Zambrana*, 841 F.2d at 1329. Authorizations to intercept communications have been upheld where

investigators had trouble identifying members of a conspiracy, such that the authorizations allowed for the identification of the extent and structure of the conspiracy. *See Santiago*, 905 F.3d at 1023, 1025 (quoting *McLee*, 436 F.3d at 763); *see also U.S. v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991); *U.S. v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995).

Here, based on the Court's review of each affidavit in support of the applications to intercept communications, it is clear that investigators made painstaking efforts to comply with the necessity or exhaustion requirement contained in § 2518(1)(c) and 3(c). Initially, with respect to each supporting affidavit, it is evident that the investigators did not employ the authorization to intercept communications as an initial step in the investigation. *See Santiago*, 905 F.3d at 1023, 1026; *accord Maggard*, 865 F.3d at 967. Indeed, the Court is hard-pressed to identify other investigative procedures that were not tried or specifically contemplated by the investigators before seeking the authorization to intercept communications from the telephones of Wheeler, Maxwell, and Smith.

On this point, the Court will not rehash its summaries of the supporting affidavits. However, it notes, in each initial supporting affidavit, the investigators utilized the following investigative techniques before seeking an authorization to intercept communications: physical surveillance; a review of toll records, pen register and trap and trace data, and subscriber information; the statements of a confidential informant and/or witness to the Bridgeton Murder; recorded calls from prison or regular phone lines; controlled purchases; and a review of public records and/or records from certain law enforcement entities. (Government's Exhibit 1, pgs. 7, 66-71, 77-78); (Government's Exhibit 5, pgs. 8, 89-93, 95-100); (Government's Exhibit 7, pgs. 5, 58-64, 66-70). Certain

affidavits also detailed the use of social media, trash searches, pole cameras and GPS tracking, financial investigations, and interviews of Maxwell and Clemon. (Government's Exhibit 5, pgs. 8, 89-93, 95-100); (Government's Exhibit 7, pgs. 5, 58-64, 66-70).

Further, at a minimum, the supporting affidavits specifically explained which "other investigative procedures ha[d] been tried and failed" and/or "why they reasonably appear[ed] to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c), (3)(c). In other words, the supporting affidavits explained the deficiencies of the above-mentioned investigative techniques. The investigators detailed, *inter alia*, evidentiary constraints, an inability to obtain complete information, limitations on identifying individuals and contents of communications, an inability to achieve the broader goals and objectives of the investigation, an inability to implicate individuals at the top of the chains of command, and an inability to identify locations of and methods for illegal activities. (Government's Exhibit 1, pgs. 7, 66-71, 77-78); (Government's Exhibit 5, pgs. 8, 89-93, 95-100); (Government's Exhibit 7, pgs. 5, 58-64, 66-70). The affidavits in support of renewed authorizations articulated these and other explanations, including: law enforcement could not identify and prosecute all co-conspirators; the witness to the Bridgeton Murder lacked knowledge of the "JD" Murder Conspiracy and the "Bo G" conflict; there were continued physical surveillance difficulties related to Smith; warrants for "Gator's" device and Smith's "burner" phones were unlikely to produce substantial evidence of the Bridgeton Murder, "JD" Murder Conspiracy, and "Bo G" Conflict; and a pole camera did not permit views of Smith's residence. (Government's Exhibit 3, pgs. 133-34); (Government's Exhibit 9, pgs. 35-37, 39-40, 42). Similarly, "Smith Wire II" noted the prior

"wires" focused on the activities of Wheeler and Maxwell, did not implicate Smith or other upper-level members of the Gangster Disciples, indicated Smith might continue to discuss issues like the "Bo G" Conflict with high-ranking members of the Gangster Disciples, and showed a reauthorization was needed to prevent violence to "Bo G." (Government's Exhibit 7, pg. 70); (Government's Exhibit 9, 46-47). Accordingly, the supporting affidavits are consistent with those that have been upheld by the Seventh Circuit. *See Maggard*, 865 F.3d at 968-69 (holding supporting affidavits established a wiretap was necessary, where a wiretap was not an "initial investigative tactic" and, in a manner very similar to this case, the government disclosed the many investigative techniques that were employed or ruled out in the conspiracy investigation); *Gray*, 410 F.3d at 343 (same); *Dumes*, 313 F.3d at 379 (same); *Ceballos*, 302 F.3d 683-84 (same).

Finally, the investigators' explanations are particularly persuasive in this case, where each affidavit in support of an authorization to intercept communications detailed specific facts about violent or narcotics-related criminal offenses, a large-scale drug trafficking organization or national Gangster Disciples Organization, and complex methods of operation for those organizations. (Government's Exhibit 1, pgs. 4-5, 17-57); (Government's Exhibit 3, pgs. 3, 19-120); (Government's Exhibit 5, pgs. 3, 4-6, 9-10, 12, 21-81); (Government's Exhibit 7, pgs. 4-5, 7-8, 13, 23-57); (Government's Exhibit 9, pgs. 4-5, 7, 12, 22-33); *See Fudge*, 325 F.3d at 919 (declining, in case involving "an intricate investigation" into "a large and dangerous drug conspiracy," to "impose implacable burdens that would frustrate" the government's use of a wiretap to "fill[] the gaps and secur[e] critical evidence against the coconspirators"); *Plescia*, 48 F.2d at 1463 (rejecting

the defendants' argument that investigators had enough evidence without electronic surveillance and/or could have obtained sufficient evidence through ordinary investigative techniques, where "the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict… key players in the drug ring"); *McLee*, 436 F.3d at 763 (holding the government demonstrated a need for a wiretap, where the supporting affidavit stated, *inter alia*, traditional investigative techniques were met with "some success" but investigators were unable to identify all the participants in a conspiracy, as well as their roles in the conspiracy, and the truth of those assertions was borne out by subsequent events).

For these reasons, the Court **FINDS**, in relation to each supporting affidavit, there was compliance with the necessity or exhaustion requirement in § 2518(1)(c) and 3(c).

## B. Minimization

Next, under § 2518(5), all orders and extensions for the authorization to intercept communications must provide that the authorization shall be, *inter alia*, conducted in a way that minimizes the interception of communications that are not subject to interception. 18 U.S.C. § 2518(5). Such orders may require reports to the issuing judge, showing the progress made toward the authorized objectives and the need for continued interception. *See id*. § 2518(6).

When considering the minimization of intercepted communications, the court must decide whether the steps taken by the investigators were objectively reasonable under the circumstances. *See U.S. v. Mansoori*, 304 F.3d 635, 647 (7th Cir. 2002) (citing *Scott v. U.S.*, 436 U.S. 128, 140 (1978)); *see also U.S. v. Quintana*, 508 F.2d 867, 873-74 (7th Cir.

1975). The adequacy of the minimization efforts cannot be determined in a generalized fashion and necessarily depend on the facts of the particular case. *See Mansoori*, 304 F.3d at 647-48. However, relevant considerations include the kind and scope of criminal enterprise under investigation, the thoroughness of the effort to ensure nonpertinent calls were minimized, the extent to which the investigators could foresee certain types of conversations would be innocuous and subject to minimization, the use of code by participants to the conversations, and the extent to which the authorizing judge oversaw the interception efforts. *See id*. at 647 (citing *Quintana*, 508 F.2d at 874-75).

Further, the Court "proceed[s] in a realistic, commonsense fashion," and the prevalence of a conspiracy may "play a part" in the analysis. *See Dumes*, 313 F.3d at 380 (quoting *Scott*, 436 U.S. at 140). Indeed, "when the investigation is of a suspected large-scale conspiracy[] and…the suspects speak in veiled terms, the government is justified in intercepting conversations that eventually prove to be without the scope of the Title III authorization." *See U.S. v. Williams*, 737 F.2d 594, 605 (7th Cir. 1984); *see also Quintana*, 508 F.2d at 874 ("Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode…especially…where…the judicially approved purpose of the wiretap is…to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy."); *Mansoori*, 304 F.3d at 647 (stating, if " 'an investigation involves a drug ring of unknown proportion…[then] "the need to allow latitude to eavesdroppers is close to its zenith." ' [Citation].").

Here, the Court initially notes that Defendants only generically argue law enforcement failed to minimize the communications intercepted pursuant to the various

applications and affidavits. *See Mansoori*, 304 F.3d at 647-48. In other words, Defendants do not specifically identify any communications that required minimization. Essentially, Defendants request that the Court find error while they fail to reveal or illuminate the bases for that error. The Court will not oblige those requests. *See Dumes*, 313 F.3d at 380 (holding the Government's minimization efforts were not shown to have been unreasonable, where, *inter alia*, the defendants did not "point to any particular conversation that should have been minimized but was not"); *Mansoori*, 304 F. 3d at 648-49 (declining to reach the merits of the defendants' "broad" and "abstract" minimization argument, where it was "deprived of the requisite basis for assessing the government's minimization efforts" because the defendants failed to, among other things, identify particular "samples" of intercepted calls or conversations that should have been, but were not, minimized).

Instead, the Court notes that Special Agent Miller reviewed the supporting affidavits, including the minimization sections, and believed the information contained therein was true and accurate. (Tr. at Doc. 636, pgs. 10-11, 16, 19-20, 23-25, 34). He was also familiar with the rules, procedures, and minimization letters written by the U.S. Attorney for the interception of communications. (Tr. at Doc. 636, pgs. 11, 16-17, 19-21, 24-26); (Government's Exhibits 2, 4, 6, 8, 10, generally). Special Agent Miller stated an Assistant U.S. Attorney held briefings for the authorizations to intercept communications, where "the letter" was presented to known monitors. (Tr. at Doc. 636, pgs. 12-13, 16-17, 20, 24-26, 55-56, 58). Further, monitors were directed to read the supporting affidavit and letter. (Tr. at Doc. 636, pgs. 56-57, 59). The signatures of the

monitors were then collected as part of the rules, procedures, and minimization letters. (Tr. at Doc. 636, pgs. 13, 20-21, 24, 26); (Government's Exhibits 2, pgs. 15-16; 4, pgs. 15-18; 6, pgs. 13-15; 8, pgs. 13-16; 10, pgs. 13-14). Most importantly, Special Agent Miller testified that, to the best of his knowledge, the procedures outlined in the rules, procedures, and minimization letters, including the ten-day reports to the issuing court, were followed in this case. *See Quintana*, 508 F.2d at 875 ("Where the judge has required and reviewed such reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions."); (Tr. at Doc. 636, pgs. 14, 17, 24, 26-27). Accordingly, the Court **FINDS** the minimization procedures were objectively reasonable in this case. *See Mansoori*, 304 F. 3d at 647 (Seventh Circuit stating it was not inclined to view the government's approach to minimization as insufficient, where the government was investigating "a 'major drug ring,' " indicated its surveillance was in good faith by submitting periodic reports to the authorization-issuing judge, and narcotics traffickers could choose their words carefully due to the knowledge that their conversations are often intercepted); (Governments Exhibits 1, pgs. 83-86; 3, pgs. 152-55; 5, pgs. 101-05, 107-08; 7, pgs. 71-75, 77; 9, pgs. 47-51, 53-54); (Government's Exhibits 2, 4, 6, 8, 10, generally).

### III. Conclusion

For the foregoing reasons, Defendants' Motions to Suppress are **DENIED**.

**SO ORDERED.**

Dated: January 10, 2023.

_____
DAVID W. DUGAN
United States District Judge